## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is dated as of January 28, 2003 (the "Agreement"), by and between Barbara Balaber-Strauss (the "Trustee") solely in her capacity as Chapter 7 Trustee of the estate (the "Estate") of HHG Corp., a New York corporation (the "Debtor"), debtor under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"), in case no. 01-B-11982 (ASH) pending in the Bankruptcy Court for the Southern District of New York and World Wrestling Entertainment, Inc. ("Buyer"). The Trustee is also referred to herein as the "Seller".

### WITNESSETH:

WHEREAS, the Debtor commenced a proceeding under Chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the Southern District of New York on April 5, 2001 (the "Bankruptcy Court");

WHEREAS, by order dated June 20, 2001, the Bankruptcy Court ordered that the Debtor's Chapter 11 case be converted to a case under Chapter 7;

WHEREAS, the Trustee was appointed interim Chapter 7 trustee of the Estate on June 22, 2001 and has become Chapter 7 trustee under Section 702 of the Bankruptcy Code;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to buy from Seller, substantially all of the assets of the Estate upon the terms and conditions set forth herein;

WHEREAS, Buyer and the Trustee are parties to a certain Stipulation and Order Regarding Use of Intellectual Property dated July 20, 2001 (the "Intellectual Property Stipulation"), which Stipulation was "So Ordered" by the Bankruptcy Court on July 20, 2001, relating to, among other things, Buyer's rights to use of certain intellectual property;

WHEREAS, Buyer has filed a proof of claim against the Debtor in the amount of $616,287.67 (the "WWE Note Claim") representing principal of $587,500 owing on two notes payable by HHG to WWE and interest of $28,747.67 and Buyer will simultaneously with the closing herein purchase the secured proof of claim of American Cable Productions ("ACP") filed against the estate in the amount of $243,000 (the "WWE ACP Claim," and together with the WWE Note Claim, the "WWE Claims");

WHEREAS, Seller, Buyer and Annodeus, Inc. ("Annodeus") have entered into a Stipulation and Order (a copy of which is attached hereto as Exhibit A) (the "Annodeus Stipulation") Settling Claims pursuant to which Annodeus, the Trustee and WWE have agreed to the treatment of the claims of Annodeus against the Estate in full settlement of said claims;

NOW, THEREFORE, in consideration of the premises and respective covenants contained herein, the parties hereto, intending to be legally bound hereby, agree, subject to Bankruptcy Court approval, as follows:

1. <u>Sale and Purchase of Assets; Assumption of Certain Obligations</u>.

NY-210942 v8 0149511-0962

# Exhibit A

(a) <u>Assets</u>. Except as provided in paragraph 1(b) hereof and subject to the terms and conditions hereof, Seller will sell, convey, assign, transfer and deliver to Buyer at the Closing (as hereinafter defined), and Buyer will purchase and accept at the Closing, all of Trustee's right, title and interest in and to the Estate's assets, properties, privileges, rights and interests (collectively, the "Assets"), including, without limitation, the following:

(i) <u>Intellectual Property</u>. Any and all intellectual property owned by the Estate or used by the Debtor in connection with the Debtor's professional wrestling business including without limitation the name "Extreme Championship Wrestling", "ECW" and variants thereof, any logos, program and pay-per-view names, character names, talent names, likenesses, rights of publicity, trade secrets, internet domain names, the entire ECW library of footage, still photographs, recordings, copyrights, copyright applications and registrations, trademarks, trade dress, service marks, trademarks and service mark applications, music, ideas and concepts regardless of the stage of development, lists of customers, suppliers, fans, consumers, magazine subscribers and other similar lists, including without limitation the names, addresses and telephone numbers of such persons and entities (any such list, including any of the Debtor's website user information, being subject to the privacy policy applicable to such list) including, without limitation, any reversionary, remainderman and similar interests in the foregoing intellectual property; and the goodwill of Seller associated with such intellectual property (including any claims in respect of past infringements and similar claims relating thereto).

(ii) <u>Tangible Assets</u>. Except for those tangible Assets, if any, rejected by the Buyer pursuant to paragraph 8(c) below, all tangible assets, including without limitation, all signage, sets, wrestling rings, training equipment and merchandise inventory, and physical embodiments of the Intellectual Property including, without limitation, video footage, photographs, recordings, copies, and sound recordings;

(iii) <u>Business Records</u>. (A) All books, records, correspondence, lists, reports, discs, tapes and other data processing media (collectively "Records") relating to the Assets and (B) all Records otherwise relating to the operations of the Seller prior to the Closing Date;

(iv) <u>Cash</u>. All cash, including all prepayments, advance guaranty payments, payments held by Seller, or paid to Seller, prior to the Closing Date, royalties due to Seller for sales of merchandise or other products, securities or investments or cash equivalents, including the Purchase Price as defined in paragraph 1(d) below (collectively "Cash"), but Cash shall not include the Excluded Cash, as defined in paragraph 1(b)(i) below;

(v) <u>Causes of Action</u>. All causes of action that the Trustee now has or may, in the future have, against any person, firm or entity including, without limitation, American Cable Productions ("ACP"), provided, however, that the Buyer is not assuming any obligations or liabilities in respect of said causes of action except as is provided in paragraph 1(c), below; and

(vi) <u>Other Assets</u>. Without limiting the preceding, all personal and fixture property of every kind and nature including, without limitation all goods (including inventory, equipment and accessions thereto) instruments, documents, accounts, chattel paper, deposit

accounts, and any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles.

(b) <u>Excluded Estate Assets</u>. Notwithstanding the terms and provisions of paragraph 1 (a) hereof, the Assets shall not include the following assets, properties, privileges, rights or interests of the Estate (the "Excluded Estate Assets"):

(i) Cash in the amount of Two Million Dollars ($2,000,000) to be paid to Annodeus as the Annodeus Payment pursuant to paragraph 7(a) hereof,

(ii) Cash in the amount of Five Hundred Ten Thousand Dollars ($510,000) or such higher amount as may result from a bid by WWE and approved by the Court as the highest and best offer at the hearing on the Sale of the Assets (the "Sale Hearing") to be retained by the Estate (the "Estate Net Proceeds", and together with the Annodeus Payment, the "Excluded Cash");

(iii) All claims, counterclaims, causes of action and rights of offset of the Estate against Joey Styles in connection with internet sales items (the "Joey Styles Claims");

(iv) All claims, counterclaims, causes of action and rights of offset against In Demand, LLC (the "In Demand Claims"); and

(v) All claims, counterclaims, causes of action and rights of offset of the Estate against Annodeus, Inc. ("Annodeus"), which claims shall be released pursuant to terms of the Annodeus Stipulation.

(vi) Those tangible Assets rejected by the Buyer pursuant to paragraph 8(c), below.

(c) <u>Assumed Liabilities</u>. At the Closing, Buyer shall assume and/or agree to pay, discharge or otherwise become liable for only the liabilities and obligations of Seller listed in subparagraph 1(c)(i) and (ii) (together, the "Assumed Liabilities") and except for said Assumed Liabilities shall not assume any other liabilities or obligations:

(i) All obligations of the Debtor and its Estate to Advanced Transportation Pension Fund, Inc., or Dollar Savings Bank, as assignee (collectively, "Advanced Transportation") up to a maximum amount of Thirty One Thousand Eight Hundred Eight and 05/100 Dollars ($31,808.05), plus interest thereon from April 17, 2002 subject to paragraph 12 hereof; and

(ii) All obligations of the Debtor and its Estate for attorneys' fees and related costs or expenses incurred in connection with the action entitled <u>HHG Corp. v. In Demand, LLC</u> (the "In Demand Action") up to a maximum amount of Fifty Thousand Dollars ($50,000), subject to paragraph 12 hereof.

(d)     Purchase Price. Buyer will purchase the Assets for an aggregate purchase price (the "Purchase Price") of One Million Two Hundred Eighty Thousand and 00/100 United States Dollars ($1,280,000.00) plus assumption of the Assumed Liabilities to approximately $82,000, or such higher amount as may be bid by WWE and accepted by the Trustee as the highest and best offer at the Sale Hearing. To the extent that such highest and best offer exceeds $1,280,000, the entire excess above $1,280,000 shall be retained by the Estate as Estate Net Proceeds in accordance with Section 1(b)(ii) hereof. On execution and delivery of this Agreement by Seller and Buyer, Buyer shall deposit with the Trustee the sum of Fifty Thousand Dollars ($50,000) in cash (the "Downpayment") as a downpayment against the Purchase Price.

(e)     Transfer Taxes. Buyer shall pay when due all applicable transfer, sales, use and bulk sales taxes. All ad valorem and property taxes and similar assessments on the Assets based upon or measured by any period that commences prior to the Closing Date and ends after the Closing Date shall be prorated between Seller and Buyer based upon the duration of the period such parties owned the Asset giving rise to such taxes or similar assessments in such period.

(f)     Access to Records.

(i)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets as is reasonably necessary for the filing of any tax return, declaration or report, the making of any election related to taxes, the preparation for any audit by any taxing authority, or the prosecution or defense of any claim, suit or proceeding regarding taxes. Should the Seller anticipate incurring any expenses in furnishing such information and assistance to Buyer, Seller shall advise the Buyer prior to furnishing such information and assistance what Buyer anticipates the costs to be. Buyer shall pay such reasonable expenses of the Trustee.

(ii)     Until such time as the Records are turned over to the Buyer under Section 2(c)(i), below, the Seller shall grant Buyer access to such Records as remain in the Trustee's possession upon reasonable notice to the Trustee.

(g)     Revenues. After the date of the Closing, all revenues, excluding those revenues received on account of the Excluded Assets, received by the Estate, less any commissions that the Trustee is awarded in respect of any such revenues under Section 326 of the Bankruptcy Code, shall be promptly transferred by the Trustee to the Buyer.

2.     Closing Date: Deliveries at the Closing.

(a)     The closing of the sale and purchase of the Assets (the "Closing") will take place at the offices of World Wrestling Entertainment, Inc., 1241 East Main Street, Stamford, Connecticut 06902 at 10:00 a.m., on the second business day following notice from Buyer to Seller or Seller to Buyer that all of the conditions contemplated in Sections 8 and 9 hereof (the date of the Closing being referred to herein as the "Closing Date") have been fulfilled.

(b)     At the Closing, Seller will execute and deliver to or cause to be delivered to Buyer, at Buyer's expense, the following:

-4-

    (i)  the Assets in the Trustee's possession, except that, subject to Section 1(f)(ii) above, the Seller may retain in her possession until the Estate is closed, those Records regarding (x) the Joey Styles Claims, (y) the In Demand Claims, and (z) the proofs of claims filed against the Debtor other than the WWE Claims.

    (ii)  such agreements, bills of sale, assignments, instruments, documents, files and records as shall be reasonably necessary to transfer title to all the Assets to Buyer;

    (iii)  a conformed copy of an entered Sale Order;

    (iv)  a release of all rights against the Buyer, except for Seller's rights against Buyer arising out of or under this Agreement; and

    (v)  such other and further documents as are reasonably requested by Buyer.

  (b)  At the Closing, Buyer shall execute and deliver to Seller the following:

    (i)  a release by Buyer of all Buyer's rights against the Seller and the Estate, except for (a) Buyer's rights arising out of or under this Agreement, and (b) Buyer's rights in respect of the WWE Claims, as allowed pursuant to Section 15 hereof;

    (ii)  the Purchase Price; and

    (iii)  such other and further documents as are reasonably requested by Seller.

3.  <u>Representations and Warranties of Seller</u>.

Seller represents and warrants to Buyer as follows:

  (a)  <u>Title to Assets</u>. Except for (i) the Assumed Liabilities, (ii) any rights of ACP in and to the ECW library of footage, (iii) the rights of Pioneer Entertainment (USA) Inc. ("Pioneer") pursuant to the license agreement between Pioneer and the Debtor dated May 24, 1999 ((i), (ii) and (iii), collectively referred to as the "Permitted Liens"), and (iv) the liens asserted by Annodeus, Seller has no actual knowledge of any mortgages, security interests, encumbrances, liens, title defects, pledges, of every kind whatsoever (the "Liens") against the Assets. Seller has not sold or otherwise disposed of any Assets.

  (b)  <u>Authority</u>. Subject to receipt of the Sale Order, Seller has full power and authority to transfer and deliver all of the Assets to Buyer in accordance with this Agreement.

  (c)  <u>Title</u>. Upon consummation of the transactions contemplated hereby, Seller will have transferred to Buyer whatever title the Estate has to the Assets, subject to the Permitted Liens, free and clear of all other Liens, as provided in the Sale Order.

  (d)  <u>Cash in the Estate</u>. As of the date hereof, the aggregate amount of cash in the Debtor's Estate totals not less than $1,287,000. The Seller shall retain such cash in the estate until the Closing Date, except that the Trustee may expend such funds as are necessary to comply with her fiduciary duties in selling the assets subject to this agreement including, but not limited

to, properly noticing and advertising the sale consistent with the provisions of paragraph 6 hereof and otherwise complying with requirements of the Bankruptcy Code, Bankruptcy Rules, Trustee's Handbook and Court Orders.

4. <u>Representations and Warranties of Buyer</u>.

Buyer represents and warrants to the Seller as follows:

(a) <u>Organization</u>. Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority to own, lease and operate its properties, and to carry on its business as now being conducted, except where the failure to have such power and authority would not, in the aggregate, have a material adverse effect on the business, operations or financial condition of Buyer.

(b) <u>Authority Concerning this Agreement</u>. Buyer has all necessary corporate power and authority to execute and deliver this Agreement and the other transaction agreements to be executed by Buyer in accordance with the terms hereof and to consummate the transactions contemplated hereby and thereby.

(c) <u>No Conflict</u>. Each of this Agreement and the other transaction agreements to be executed by Buyer in accordance with the terms hereof has been duly and validly executed and delivered by Buyer and constitutes the legal, valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, subject in each case to (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (ii) principles of equity.

5. <u>Bankruptcy Court Approval</u>

(a) <u>Bidding Procedures Motion</u>. Seller shall file a motion on or before January 29, 2003 (the "Bidding Procedures Motion"), and use its best efforts to obtain from the Bankruptcy Court a bidding procedures order (the "Bidding Procedures Order") in form and substance acceptable to Buyer, providing among other things, for sale/auction procedures, including minimum overbid requirements.

(b) <u>Overbid Requirements</u>. Subject to the Bankruptcy Court's approval, the Bidding Procedures Order will provide (i) minimum overbid requirements of Twenty Five Thousand and 00/100 Dollars ($25,000) over the amount of $1,280,000 and increments of not less than Ten Thousand and 00/100 Dollars ($10,000) over the then-highest bid for any additional bids; and (ii) that any buyer shall assume the Assumed Liabilities. The highest and best offer will be determined by the amount of cash to be retained by the Estate in accordance with Section 1(b)(ii) hereof, after payment of the Annodeus Payment, plus the value of the Assumed Liabilities. Other auction requirements to be reasonably approved by Buyer in advance of the filing of the Bidding Procedures Motion shall include requirements regarding the ability of any potential bidders to consummate an alternative transaction, the nonexistence of financing and/or due diligence conditions to closing and the requirement that all competing bids be on terms and conditions substantially similar to the terms and conditions set forth in this Agreement.

(c) <u>Sale Order</u>. Buyer's and Seller's obligations to consummate the Closing will be conditioned upon the entry by the Bankruptcy Court of a final order (the "Sale Order") reasonably acceptable to Buyer approving the transactions contemplated hereby finding that notice of the hearing concerning approval of the transactions contemplated hereunder was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances under the Bankruptcy Code and in accordance with any other law, that Seller has the legal right and capacity to convey all the rights, title and interest of Seller in and to the Assets, that Buyer is a good faith Buyer entitled to the protections afforded by Bankruptcy Code Section 363 (m), and providing for the sale of the Assets free and clear of all Liens other than the Permitted Liens with any other Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing. Notwithstanding the preceding, Buyer and Seller may jointly elect that the Closing take place at any time after the Sale Order has been entered regardless of whether the Sale Order is a final order. As used herein, the term "final order" means an order or judgment of a court as to which the time to appeal, petition for *certiorari* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been sought, such order of judgment of such court shall have been determined by the highest court to which such order was appealed, or *certiorari*, or reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired.

6. <u>No Solicitation of Transactions</u>.

From the date hereof until the Closing or until this Agreement is terminated in accordance with paragraph 13 hereof, except as required by Order of the Bankruptcy Court, neither Seller nor the Debtor or any of its affiliates nor any of its respective officers, directors or agents may enter into any letter of intent or purchase agreement, merger agreement or other similar agreement with any person, firm or corporation other than Buyer with respect to the sale of any of the Assets except that the Seller may send notice of the Bidding Procedures Motion and the Sale to interested parties. Notwithstanding the preceding or any term or provision contained in this Agreement appearing to the contrary, Buyer acknowledges that the Trustee is obligated to consider higher and better bids from third parties for the Assets and, in connection therewith, may furnish information, respond to any offer for and advertise the sale of the Assets without violating the terms of this Section 6. Seller agrees that, if a third party makes an offer prior to the hearing on the Sale of the Assets, the Trustee shall immediately notify the Buyer of the terms and amount of the offer.

7. <u>Covenants of Seller</u>.

(a) On the Closing Date, as set forth in the Annodeus Stipulation, Seller shall pay a total of Two Million Dollars ($2,000,000) (the "Annodeus Payment") to Annodeus representing One Million Seven Hundred Thousand Dollars ($1,700,000) in full settlement and satisfaction of the secured claim asserted by Annodeus in respect of the advances made by Annodeus to the Debtor under the Revolving Credit and Security Agreement dated August 25, 1999 between Annodeus and the Debtor (the "Revolving Credit Agreement") and the Purchase and Sale

Agreement dated March 1, 2000 between Debtor and Annodeus (the "Purchase and Sale Agreement"), and Three Hundred Thousand Dollars ($300,000) in exchange for a full release of any obligation owed by the Debtor under any and all license agreements between Annodeus and the Debtor; and

   (b)   On the Closing Date, after making the Annodeus Payment, the Trustee shall distribute any Cash exceeding the Estate Net Proceeds to the Buyer.

8.   <u>Conditions to the Obligations of Seller to Effect the Transactions Contemplated Hereby</u>.

The obligations of the Seller to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions, any one or more of which may be waived by Seller:

   (a)   None of the parties hereto shall be subject on the Closing Date to any order, decree or injunction of a court of competent jurisdiction which enjoins or prohibits the consummation of the transactions contemplated by this Agreement or any other document or agreement to be executed by Buyer in connection herewith, nor shall there be pending a suit or proceeding by any governmental authority that seeks injunctive or other relief in connection with such transactions.

   (b)   The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all respects (in the case of any representation and warranty containing a materiality qualification) or in all material respects (in the case of any representation and warranty without any materiality qualification) as of the Closing Date as though made as of such date. Buyer shall have performed and complied in all material respects with all covenants and agreements contained in this Agreement required to be performed and complied with by it at or prior to the Closing Date.

   (c)   At least 3 business days prior to the Closing Date, Buyer shall inform the Seller as to which Tangible Assets, if any, it shall not take delivery of under this Agreement.

   (d)   All documents required hereunder to have been delivered by Buyer to Seller, and all actions required hereunder to have been taken by Buyer shall have been delivered or taken, including Payment of the Purchase Price.

   (e)   The entry of the Sale Order as provided in Section 5(c).

   (f)   Payment of the Purchase Price to Seller.

9.   <u>Conditions to the Obligations of Buyer to Effect the Transactions Contemplated Hereby</u>.

The obligations of Buyer to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions, any one or more of which may be waived by Buyer:

(a) None of the parties hereto shall be subject on the Closing Date to any order, decree or injunction of a court of competent jurisdiction which enjoins or prohibits the consummation of the transactions contemplated by this Agreement or any other document or agreement to be executed by Seller in connection herewith, nor shall there be pending a suit or proceeding by any governmental authority that seeks injunctive or other relief in connection with such transactions.

(b) All representations and warranties of Seller set forth in this Agreement shall be true and correct in all respects (in the case of any representation and warranty containing a materiality qualification) or in all material respects (in the case of any representation and warranty without any materiality qualification) as of the Closing Date as though made as of such date. Seller shall have performed and complied in all material respects with all covenants and agreements contained in this Agreement required to be performed and complied with by it at or prior to the Closing Date.

(c) All documents required hereunder to have been delivered by Seller to Buyer, and all actions required hereunder to have been taken by the Seller, shall have been delivered or taken.

(d) If the Trustee possesses any Tangible Assets, at least 14 days before the Closing Date, Seller shall make those Tangible Assets in her possession available to Buyer for Buyer's inspection.

(e) The entry of the Sale Order as provided in Section 5(c).

(f) The Annodeus Claim Stipulation shall have been so ordered by the Court.

10. <u>Limitation on and Survival of Representations and Warrantees</u>.

(a) Apart from the specific representations and warranties included herein, the Assets are being sold as is, where is. Buyer acknowledges that Seller is making no representations or warranties, express or implied, of any nature whatsoever with respect to the Assets, other than representations and warranties of Seller specifically set forth herein.

(b) The representations and warrantees of Seller and Buyer contained in Paragraph 3 and 4 hereof, respectively, shall not survive the closing of this Agreement.

11. <u>Annodeus Claims Stipulation</u>.

(a) Pursuant to the Annodeus Stipulation, Annodeus, the Trustee, and WWE have agreed, subject to approval by this Court, that the Annodeus Payment described in Section 7(a), above, shall be in full settlement of any and all Claims of any kind of Annodeus against the Estate, the Trustee and their successors and assigns, including any secured claims and any claims based on any license agreements between Annodeus and the Debtor.

(b) Pursuant to the Annodeus Stipulation, WWE has agreed, subject to approval by this Court, that no pending litigation or other dispute between WWE and Annodeus involving

matters unrelated to the Annodeus Stipulation, the Revolving Credit Agreement or the Annodeus Purchase and Sale Agreement shall affect WWE's obligations to pay the Purchase Price as set forth herein.

12. <u>Assumed Liabilities</u>.

(a) Seller shall have the right to contest through a final order in the Bankruptcy Court the validity, perfection and the extent of the alleged secured claim of Advanced Transportation.

(b) Seller shall have the right to contest through a final order in the Bankruptcy Court the extent of the administration claim for attorneys' fees and related costs and expenses incurred in connection with the In Demand Action.

13. <u>Termination</u>.

(a) <u>Termination</u>. This Agreement may be terminated at any time at or prior to the Closing (the "Termination Date"):

(i) in writing, by mutual consent of the parties;

(ii) by written notice from Seller to the Buyer if the Buyer (i) fails to perform in any material respect any of its agreements contained in this Agreement required to be performed by it on or prior to the Closing Date or (ii) materially breaches any of its representations and warranties contained in this Agreement, which failure or breach is not cured within ten (10) days after Seller has notified Buyer of its intent to terminate this Agreement pursuant to this subparagraph (ii);

(iii) by written notice from the Buyer to Seller, if Seller (i) fails to perform in any material respect any of its agreements contained in this Agreement required to be performed by it on or prior to the Closing Date or (ii) materially breaches any of its representations and warranties contained in this Agreement, which failure or breach is not cured within ten (10) days after Buyer has notified Seller of its intent to terminate this Agreement pursuant to this subparagraph (iii); or

(iv) by written notice from Buyer to Seller, if Seller shall not have filed the Bidding Procedures Motion on or before 20 days of the execution of this Agreement, provided that Buyer agrees that, if it has not already given such written notice of termination prior to the time the Bidding Procedures Motion has been filed, Buyer will have no right to give such termination notice under this subsection 13(a)(iv);

(v) by written notice from Buyer to Seller, if the Trustee does not use her best efforts to have the Bidding Procedures Motion approved by the Bankruptcy Court on or before 30 days after the filing of the Bidding Procedures Motion, and Buyer agrees that, if it has not already given such written notice of termination prior to the time the Bidding Procedures Motion has been approved, Buyer will have no right to give such termination notice under this subsection 13(a)(v);

(vi)   by written notice from Buyer to Seller, if the Seller has not submitted a Sale Order to the Court within 45 days after the Court has approved the Bidding Procedure Motion and/or if the Trustee does not use her best efforts to have the Court approve the Sale Order within 14 days of the submission of the Sale Order to the Court, provided that Buyer agrees that, if it has not already given such notice of termination prior to the Seller's submission of the Sale Order to the Court, Buyer will have no right to give such termination notice under this subsection 13(a)(vi).

(vii)   automatically, without notice, if Buyer is not the winning bidder in the bidding conducted pursuant to the Bidding Procedures Order.

(b)   Effect of Termination. If this Agreement is terminated pursuant to Section 13(a) hereof, except as to any obligation which is expressly provided to survive the Closing, all further obligations of the parties under this Agreement shall terminate; provided, however, that no party shall be relieved of any obligations or other liability resulting from any breach by such party of any provision of this Agreement. In the event that this Agreement is terminated for any reason other than pursuant to Section 13(a)(ii), the Downpayment shall be refunded to Buyer and Buyer shall have no other remedy against Seller. If this Agreement is terminated pursuant to Section 13(a)(ii) prior to the entry of the Sale Order, Seller shall retain the Downpayment as liquidated damages as its sole and exclusive remedy against Buyer provided, however, that Buyer shall have the right to contest any alleged breach by Buyer of this Agreement in the Bankruptcy Court. If, after the Court has entered the Sale Order, this Agreement is terminated pursuant to Section 13(a)(ii), the Buyer shall pay $250,000 to the Seller (inclusive of the Downpayment) as liquidated damages and such payment shall be the Seller's sole and exclusive remedy against the Buyer, provided, however, that Buyer shall have the right to contest any alleged breach by Buyer of this Agreement in Bankruptcy Court.

14.   Indemnification.

(a)   Buyer will indemnify and hold harmless Seller and the Estate and their respective subsidiaries and affiliates and their respective officers, directors, employees, agents and representatives and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "Seller Indemnified Parties") from, against and in respect of any and all claims, liabilities, obligations, losses, costs, expenses, penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including, without limitation, amounts paid in settlement, costs of investigation and reasonable attorneys' fees and expenses) arising out of or relating to the Assumed Liabilities, any breach of any covenant, agreement or undertaking made by Buyer in this Agreement, or, except in connection with any Liens other than Permitted Liens against the Assets, any obligations or claims, liabilities, obligations, losses, costs, expenses penalties, fines and judgments (at equity or at law, including statutory and common) and damages whenever arising or incurred (including, without limitation, amounts paid in settlement, costs of investigation and reasonable attorneys' fees and expenses) arising out of or related to the Assets after the Closing Date. The claims, liabilities, obligations, losses, costs, expenses, penalties, fines and damages of Seller Indemnified Parties described in this Section 14 (a) as to which Seller Indemnified Parties are entitled to indemnification are hereinafter collectively referred to as "Seller Losses."

(b) <u>Indemnification Procedure.</u>

(i) Promptly after receipt by a Seller Indemnified Party (hereinafter collectively referred to as an "Indemnified Party") of notice by a third party (including any court or governmental or regulatory authority) of any complaint or the commencement of any audit, investigation, action or proceeding with respect to which such Indemnified Party may be entitled to receive payment from the Buyer for any Seller Losses, such Indemnified Party will notify Buyer (the "Indemnifying Party"), promptly following the Indemnified Party's receipt of such complaint or of notice of the commencement of such audit, investigation, action or proceeding; provided, however, that the failure to so notify the Indemnifying Party will relieve the Indemnifying Party from liability under this Agreement with respect to such claim only if, and only to the extent that, such failure to notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such claim. The Indemnifying Party will have the right, upon written notice delivered to the Indemnified Party within ten (10) days after receipt of such notice to assume full responsibility for any Seller Losses (as the case may be) resulting from such audit, investigation, action or proceeding, and to assume the defense of such audit, investigation, action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel. In the event, however, that the Indemnifying Party declines or fails to assume the defense of the audit, investigation, action or proceeding on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such ten (10)-day period, then such Indemnified Party may employ counsel to represent or defend it in any such audit, investigation, action or proceeding and the Indemnifying Party will pay the reasonable fees and disbursements of such counsel as incurred; provided, however, that the Indemnifying Party will not be required to pay the fees and disbursements of more than one (1) counsel for all Indemnified Parties in any jurisdiction in any single audit, investigation, action or proceeding. In any audit, investigation, action or proceeding with respect to which indemnification is being sought hereunder, the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such action, will have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party, as the case may be, will at all times use reasonable efforts to keep the Indemnifying Party or the Indemnified Party, as the case may be, reasonably apprised of the status of the defense of any matter the defense of which they are maintaining and to cooperate in good faith with each other with respect to the defense of any such matter.

(ii) No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless (A) the Indemnifying Party fails to assume and maintain the defense of such claim pursuant to Section 14(c)(i) or (B) such settlement, compromise or consent includes an unconditional release of the Indemnifying Party from all liability arising out of such claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless (A) such settlement, compromise or consent includes an unconditional release of the Indemnified Party from all liability arising out of such claim, (B) does not contain any admission or statement

-12-

suggesting any wrongdoing or liability on behalf of the Indemnified Party and (C) does not contain any equitable order, judgment or term which in any manner affects, restrains or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

    (iii) In the event an Indemnified Party claims a right to payment pursuant to this Agreement, such Indemnified Party will send written notice of such claim to the appropriate Indemnifying Party. Such notice will specify the basis for such claim. As promptly as possible after the Indemnified Party has given such notice, such Indemnified Party and the appropriate Indemnifying Party will establish the merits and amount of such claim (by mutual agreement, litigation, arbitration or otherwise) and, within five (5) business days of the final determination of the merits and amount of such claim, the Indemnifying Party will pay to the Indemnified Party immediately available funds in an amount equal to such claim as determined hereunder.

15. <u>Allowance of Proofs of Claim.</u>

  (a) The WWE Note Claim shall be allowed in the amount as filed of $616,287.67, representing principal owing to WWE of $587,500 plus interest of $28,787.67 through the Petition Date and allowed in said amount as an unsecured claim.

  (b) The WWE ACP Claim shall be allowed in the amount as filed as a general unsecured claim.

16. <u>Modification of Intellectual Property Stipulation.</u>

  The Intellectual Property Stipulation is hereby modified to provide that the $50,000 paid thereunder shall not be credited against the Purchase Price hereunder.

17. <u>Miscellaneous Provisions.</u>

  (a) <u>Commissions.</u> Each party represents and warrants to the other party that it has not incurred and will not incur any liability for brokerage fees or agents' commissions in connection with this Agreement and the transactions contemplated hereby. Seller and Buyer shall each pay all brokerage fees, commissions (except as provided in Section 1(g) hereof) or finder's fees, if any, incurred by such party, and shall indemnify and hold the other harmless from and against any and all claims or liabilities for brokerage fees, commissions and finder's fees incurred by reason of any action taken by such party.

  (b) <u>Expenses.</u> Whether or not the transactions contemplated hereby are consummated, except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, except as otherwise provided herein, will be paid by the party incurring such costs and expenses.

  (c) <u>Further Assurances.</u> The parties shall from time to time do and perform such additional acts and execute and deliver such additional documents and instruments as may be reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the purposes of this Agreement. Buyer shall also provide such information as Seller may

reasonably request for purposes of financial accounting or preparing tax reports or returns or responding to audits thereof.

(d) Amendment and Modification. This Agreement may be amended, modified or supplemented at any time after the Closing Date but only by the written agreement of all the parties hereto.

(e) Waiver of Compliance; Consents. Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 16(e).

(f) Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been given when delivered by hand or by facsimile transmission, when telexed or upon receipt when mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

    (i)    If to Seller:

        Barbara Balaber-Strauss, Esq.
        81 Main Street
        White Plains, New York 10601

    And

        Serchuk & Zelermyer LLP
        81 Main Street
        White Plains, New York 10601

        Attn: David Pollack, Esq.

    (ii)    If to Buyer:

        World Wrestling Entertainment, Inc.
        1241 East Main Street
        Stamford, CT 06902

        Attn: Chief Financial Officer

    And

        World Wrestling Entertainment, Inc.

1241 East Main Street
Stamford, CT 06902

Attn: General Counsel

(g)     Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except for an assignment by Buyer to an affiliate of Buyer, in which case Buyer and its affiliate shall remain jointly and severally liable for the obligations of Buyer hereunder, neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any party hereto without the prior written consent of the other party. This Agreement is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

(h)     Governing Law. This Agreement shall be governed by and construed under the laws of the State of New York, without regard to its conflict of laws rules. Seller and Buyer (i) agree that any disputes arising hereunder shall be submitted to and determined by the Bankruptcy Court and (ii) agree to the continuing jurisdiction of the Bankruptcy Court to the fullest extent allowed and, to the extent not allowed, to the jurisdiction of the state or federal courts located in New York City, and (b) to the service of legal process in accordance with the laws of the State of New York.

(i)     Counterparts. This Agreement may be executed in one or more counterparts, none of which need contain the signatures of all parties, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than the number of counterparts containing the respective signatures of, or on behalf of, all of the parties hereto.

(j)     Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(k)     Interpretation. The descriptive headings contained in this Agreement are for convenience of reference only and shall have no effect on the interpretation or meaning hereof. The word "Agreement" refers to the body of this Agreement, and all Exhibits and Schedules attached hereto or referred to herein. "Herein," "hereof" and the like refer to this Agreement as a whole. As used in this Agreement, the singular shall include the plural, the plural shall include the singular and each gender shall include all genders.

(l)     Entire Agreement. This Agreement, including the Exhibits and Schedules attached hereto (and any other documents contemplated hereby) and the Stipulation between the parties embody the entire agreement and understanding of the parties with respect to the transactions contemplated by this Agreement. The Exhibits and Schedules hereto are an integral part of this Agreement and are incorporated by reference herein. This Agreement, the Stipulation and such

other documents supersede all prior discussions, negotiations, agreements and understandings between the parties with respect to the transactions contemplated hereby that are not reflected or set forth in this Agreement or the Exhibits and Schedules attached hereto. The Schedules and Exhibits attached hereto are incorporated herein by reference. Any information set forth on any Exhibit or Schedule shall be deemed to have been disclosed for all purposes hereunder.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

                                **BARBARA BALABER-STRAUSS, AS TRUSTEE OF HHG CORP.**

                                By: s/ Barbara Balaber-Strauss, Trustee

                                **WORLD WRESTLING ENTERTAINMENT, INC.**

                                By: ___Edward L. Kaufman___
                                Title: Senior Vice-President & General Counsel